FILED

2016 Feb-08  PM 04:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED MINE WORKERS OF AMERICA COMBINED BENEFIT FUND and UNITED MINE WORKESR OF AMERICA 1992 BENEFIT PLAN,** | } } } } } | |
| **Appellants,** | } } | |
| **v.** | } } | **Case No.:  2:16-cv-00064-RDP** |
| **WALTER ENERGY, INC.,** | } } } | |
| **Appellee.** | } | |

## MEMORANDUM OPINION

This matter is before the court on the Appellants'[1] Emergency Motion for a Stay Pending Appeal. (Doc. # 16).  The matter has been fully briefed (Docs. # 17, 20, 21, 25, 30, 31, 32), and on February 1, 2016, the court heard argument on the Motion (Doc. # 29).[2]

This appeal concerns the Bankruptcy Court's Order (1) Approving the Sale of the Acquired Assets Free and Clear of Claims, Liens, Interests and Encumbrances; (2) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (3) Granting Related Relief.  (Doc. # 1-3 (the "Sale Order")).  Pursuant to 11 U.S.C. § 363(f), the Sale Order permits a free and clear sale of certain of Appellee's assets including future premiums

---

[1] Appellants in this appeal will be referred to interchangeably as "Appellants" and the "Coal Act Funds."

[2] Appellant the United Mine Workers of America ("UMWA") filed a Joinder of the Coal Act Funds' Emergency Motion for a Stay Pending Appeal in 2:16-cv-65-RDP (Doc. # 12).  Appellant UMWA in 2:16-cv-56-RDP, and Appellants UMWA 1974 Pension Plan and Trust, *et al*, in 2:16-cv-57-RDP did not formally file joinders. But, those appeals also relate to the underlying Bankruptcy Court Sale Order, and the parties and this court have considered those appeals for purposes of the subject Emergency Motion for a Stay Pending Appeal.  In summary, the only unique argument advanced by any Appellant for a stay is in this appeal.

under the Coal Act. 26 U.S.C. §§ 9701-22. (Doc. # 1). The Coal Act Funds contend that the

Bankruptcy Court lacked jurisdiction under the Tax Anti Injunction Act (26 U.S.C. § 7421), and

Section 363(f) does not apply to the assessment of post-sale Coal Act premiums.  (*See* Docs. #

13, 17).

**I.      Standard of Review**

In assessing a motion for stay pending appeal, a court must consider: "(1) whether the

stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether

the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will

substantially injure the other parties interested in the proceeding; and (4) where the public

interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *Hilton v. Braunskill*, 581 U.S.

770, 776 (1987)). As the party seeking a stay, the Appellants bear a heavy burden to show that

this extraordinary remedy is warranted. *See Nken*, 556 U.S. at 427 (noting that stay of a final

order pending review amounts to "intrusion into the ordinary processes of administration and

judicial review") (citation omitted); *McCammon v. United States*, 584 F. Supp. 2d 193, 197

(D.D.C. 2008) ("granting a stay pending appeal is always an extraordinary remedy, and ... the

moving party carries a heavy burden to demonstrate that the stay is warranted." (citation and

internal quotation marks omitted)); *Gay Lesbian Bisexual Alliance v. Sessions*, 917 F. Supp.

1558, 1561 (M.D. Ala. 1996) (stay pending appeal "is considered extraordinary relief for which

the moving party bears a heavy burden" (citation omitted). The first factor has traditionally been

viewed as the most important.  Moreover in applying these factors, the Supreme Court has found

it "'appropriate to balance the equities' to assess the relative harms to the parties, 'as well as the

interests of the public at large.'" *Ind. State Police Pension Tr. v. Chrysler LLC*, 556 U.S. 960,

960 (2009) (*per curiam*) (quoting *Conkright v. Frommert*, 556 U.S. 1401, 1402 (2009)); *see also*

*In re Voluntary Purchasing Grp., Inc.*, 196 F.3d 1258 (5th Cir. 1999) (*per curiam*) (finding error by the district court for not properly balancing the equities). To balance the equities (or the harms), the court "weigh[s] the likely harm to the movant (absent a stay (factor two) against the likely irreparable harm to the stay opponent(s) if the stay is granted (factor three)." *In re Revel AC, Inc.*, 805 F.3d 558, 569 (3d Cir. 2015). And, the court must "also take into account where the public interest lies (factor four)." *Id.*

Although the parties mostly agree about how these factors should be articulated, they disagree over the standard of review this court should apply in reviewing the record and the bankruptcy court's decision on the Motion to Stay filed before it—*i.e.*, whether it is *de novo* or whether this court must be more deferential to the bankruptcy court. (Doc. # 25 at n.1).

## II.   Discussion

After careful review, and with the benefit of oral argument, the court concludes that any debate about the standard of review to be applied here is academic because, under any standard, the Motion is due to be denied.

### A.   Likelihood of Success on Appeal

It is well-established that the likelihood of success on the merits is ordinarily the "most important" factor in the analysis and requires, at a minimum, a showing of a "substantial case on the merits," even upon a strong showing of the other three factors. *Garcia–Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986); *see also Nken*, 556 U.S. at 434 ("It is not enough that the chance of success on the merits be better than negligible" and "more than a mere possibility of relief is required.") (citations omitted); *Al Maqaleh v. Gates*, 620 F. Supp. 2d 51, 56 (D.D.C. 2009) (as to the first factor, movant must at least raise "serious legal questions going to the merits, so serious, substantial difficult as to make them a fair ground of litigation." (citations

3

omitted)); *Fullmer v. Michigan Dep't of State Police*, 207 F. Supp. 2d 663, 664 (E.D. Mich. 2002) (movant seeking a stay of judgment pending appeal "must ordinarily demonstrate to a reviewing court that there is a likelihood of reversal" and "is always required to demonstrate more than the mere possibility of success on the merits") (citations omitted).   After careful review, and with the benefit of oral argument, the court concludes that Appellants have not shown that there is a "strong showing that [they are] likely to succeed on the merits," nor do the other factors heavily tilt in Appellants' favor.   *Nken*, 556 U.S. at 434.

The Coal Act Funds first argue that their appeal has merit because, under the Tax Anti-Injunction Act, the bankruptcy court does not have jurisdiction to affect Coal Act premiums before they are assessed because those premiums are "taxes."   (Doc. # 17 at 11).   Second, they contend that Section 363(f) of the bankruptcy code cannot be used to extinguish future Coal Act tax assessments.   (Doc. # 17 at 12).   And finally, they assert that any construction of Section 363(f) that would permit premature interference with Coal Act tax assessments violates the Coal Act itself.   (*Id.*).   The court addresses each of these issues, in turn.

## 1.      The Tax Anti-Injunction Act's Application

The Tax Anti-Injunction Act withdraws from federal courts' subject-matter jurisdiction the power to "restrain[] the assessment or collection of any tax."   26 U.S.C. § 7421(a).   The statute applies to "any tax" and precludes attempts to impede the raising of revenues to fund governmental and government-sponsored endeavors.   *Alexander v. Ams. United Inc.*, 416 U.S. 752, 760 (1974).   The Eleventh Circuit has not yet had the occasion to address whether Coal Act assessments are taxes or, alternatively, should be given some different characterization.   The court recognizes that there are courts outside our circuit which have found that the payments at issue under the Coal Act should be construed as "taxes."   *See, e.g., UMWA 1992 Benefit Plan v.*

*Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573, 583 (4th Cir. 1996), *cert. denied,* 520 U.S. 1118 (1997). But those decisions reached that conclusion without the benefit of a recent, highly pertinent Supreme Court decision. *National Federation of Independent Business v. Sebelius*, –––U.S. –––, 132 S. Ct. 2566 (2012) ("*NFIB*"). The *NFIB* Court observed that, because "[i]t is up to Congress whether to apply the Anti–Injunction Act to any particular statute, ... it makes sense to be guided by Congress's choice of label on that question." *NFIB*, 132 S. Ct. at 2594. Based upon this tautological principle, the Court concluded that Congress's choice to label the individual mandate "as a 'penalty,' not a 'tax'," was "fatal to the application of the [Tax] Anti–Injunction Act." *Id.* Similarly, and applying *NFIB* here, the court concludes that, in the Coal Act context, Congress's characterization of the payments at issue as "premiums," not taxes, is "fatal to the application of the [Tax] Anti–Injunction Act." *NFIB*, 132 S. Ct. at 2594; *see* 26 U.S.C. § 9704(a) – (j); 26 U.S.C. § 9712(d)(1)(A).

The court agrees that in *NFIB* the Supreme Court did not endorse a formalistic, label-driven approach to the Tax Anti-Injunction Act. But this application of *NFIB* and the conclusion reached here make legal sense for other reasons. For example, at its core, the Coal Act[3] essentially functions akin to a funding mechanism for a multi-employer benefit plan, not as a taxing scheme. For purposes of federal income tax, it allows a coal company to take tax

---

[3] This court has previously addressed the origin and purpose of the Coal Act:

> The Coal Act requires present and former coal operators, such as the plaintiffs in this case, to pay for the health benefits of coal industry retirees and their dependents. 26 U.S.C. §§ 9702, 9704. Congress passed the Coal Act in 1992 to ensure that retired coal miners and their dependents and widows continue to receive the lifetime health benefits guaranteed by earlier collective bargaining agreements with coal operators. Before the Coal Act was passed, the two multi-employer health care plans that provided benefits to retired miners (the "Plans") were operating at a deficit. The financial instability of the Plans led to a breakdown in labor relations, the cessation of operator contributions to the Plans, and an eleven-month strike by mine workers. *National Coal Association v. Chater*, 81 F.3d 1077, 1078-79 (11th Cir. 1996). In an effort to remedy the funding problems yet maintain a privately financed program, Congress consolidated the Plans into the Combined Fund with financing primarily provided by coal operators.

*AJ Taft Coal Co., Inc. v. Barnhart*, 291 F. Supp. 2d 1290, 1295 (N. D. Ala. 2003).

deductions for its premiums just as it would for contributions to a multi-employer benefit plan. *See* 26 U.S.C. §§ 9704(g)(2), 9712(d)(5).  The assessments are made and received by a private, non-governmental trust.  The funds are used to pay for health and welfare benefits of retired mine workers who previously worked for private businesses.  In any way material to their characterization, the assessments are treated no differently than ERISA or Multi-employer Benefit Plans.  Enforcement, if necessary, is executed by the same private group which assesses the premiums.  *See* 26 U.S.C. § 9721.  All of this points to a straight-forward conclusion ─ the Coal Act was not designed to raise revenue to fund governmental or government-sponsored endeavors.

But even if the court viewed the Coal Act's treatment of premiums and the intervening *NFIB* decision differently, and even assuming further the Coal Act premium payments could be viewed as taxes, the same result would be reached here.   Appellants' Anti-Injunction Act argument has previously been rejected by the only Circuit Court to consider the precise issue.  In *Leckie*, the Fourth Circuit held that "the Anti–Injunction Act 'was not intended to bar an action where ... Congress has not provided the plaintiff with an alternative legal way to challenge the validity of a tax.'"  *Leckie*, 99 F.3d at 584 (ellipsis in original) (quoting *South Carolina v. Regan*, 465 U.S. 367, 370–71 (1984)).  In all relevant respects, *Leckie* is on all fours with the issues before the court.[4]

In *Leckie*, bankrupt coal operators sought to secure a declaration from the bankruptcy court that the purchasers of their assets would not be liable for Coal Act premiums as potential successors-in-interest to the bankrupt coal operators. The Fourth Circuit concluded that, at least before the act of sale, the bankrupt coal operators "[did] not have any 'alternative legal way' to

---

[4] The court acknowledges that the *Leckie* court found that Coal Act payments were taxes.  But, again, this ruling was made without the benefit of the Supreme Court's *NFIB* decision.

challenge the imposition of Coal Act successor liability on the purchasers of their assets." *Id*. The *Leckie* operators and the potential purchasers "need[ed] to know whether they [could] sell their assets free and clear of liability for their Coal Act premiums." *Id*.  Thus, the debtor/coal operators sought a declaration regarding what responsibility, if any, the potential purchasers would have to make Coal Act premium payments. The Fourth Circuit held that neither the Tax Anti–Injunction Act nor the Declaratory Judgment Act precluded the bankruptcy court from considering the merits because "the Coal Act [does not] provide any means by which a coal operator can challenge the imposition of successor liability on a third party." *Id*.

For these and other reasons, the court concludes that Appellants have not made a strong showing that they likely are to succeed on the merits on this appeal.

## 2. Section 363(f)'s Application

The bankruptcy court has the power to approve the sale of a debtor's assets free and clear of any interest or claims that could be brought against the bankrupt estate during a bankruptcy. 11 U.S.C. § 363(f); *see In re Odes Ho Kim*, 748 F.3d 647, 654-55 (5th Cir. 2014); *Al Perry Enterprises, Inc. v. Appalachian Fuels, LLC*, 503 F.3d 538, 543 (6th Cir. 2007).  Appellants argue that "interests" to which Section 363(f) applies exclude future Coal Act assessments.  The court disagrees.

Section 363(f) of the Bankruptcy Code authorizes the sale of property of an estate "free and clear of any interest in such property." 11 U.S.C. § 363(f).  Appellants urge a somewhat narrow reading of Section 363(f).  Their argument goes like this:  Section 363(f) applies only to *in rem* interests, Coal Act premiums are not *in rem* interests, and therefore Section 363(f) has no application here.  As explained below, that argument misses the mark.

7

A minority of courts have narrowly interpreted the term "interests in property" as used in Section 363(f) to mean *in rem* interests in property, such as liens. *See, e.g., In re White Motor Credit Corp.*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("General unsecured claimants including tort claimants, have no specific interest in a debtor's property. Therefore, Section 363 is inapplicable for sales free and clear of such claims."); *In re New England Fish Co.*, 19 B.R. 323, 326 (Bankr. W.D. Wash.1982) (same).  But while a minority number of courts initially interpreted the phrase "interest in such property" narrowly, Section 363(f) has more often (and more correctly) been given a broad reading to effectuate the purposes of the Bankruptcy Code. *See Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132 (6th Cir. 1991); *Leckie*, 99 F.3d at 582; *In re Trans World Airlines, Inc.*, 322 F.3d 283, 289–90 (3d Cir. 2003); *In re Chrysler LLC*, 576 F.3d 108, 112 (2d Cir.) *cert. granted, judgment vacated sub nom. Indiana State Police Pension Trust v. Chrysler LLC*, 558 U.S. 1087, 130 S. Ct. 1015, 175 L. Ed. 2d 614 (2009) a*nd vacated sub nom. In re Chrysler*, LLC, 592 F.3d 370 (2d Cir. 2010).  Indeed, "the 'modern trend' of bankruptcy courts [is] to ascribe a broad meaning to the term 'any interest' as used in § 363."  *In re PBBPC, Inc.*, 484 B.R. 860, 867 (B.A.P. 1st Cir. 2013).  This more expansive reading of "interests in property" also "encompasses other obligations that may flow from ownership of the property." *In re Trans World Airlines, Inc.*, 322 F.3d at 291 (3d Cir. 2003) (citing 3 Collier on Bankruptcy ¶ 363.06[1]).

The "more expansive reading of the term 'any interest'" has been advanced by the First, Second, Third, Fourth and Seventh Circuits. *In re PBBPC, Inc.*, 484 B.R. at 869.  As the First Circuit has noted, this broad interpretation is more consistent with the language of the Bankruptcy Code, and is consistent with the general policy of the Bankruptcy Code to maximize the value of the bankruptcy estate. *Toibb v. Radloff*, 501 U.S. 157, 163 (1991). An expansive

interpretation of the term "interest in property" that can be cut off by a "free and clear" order under Section 363(f) promotes that policy by, *inter alia*, maximizing the value of the assets that are being sold. *See Douglas v. Stamco*, 363 Fed. Appx. 100, 102–03 (2d Cir. 2010) (the potential chilling effect of not allowing sales of assets free and clear of interests subsequent to the sale would run counter to a core aim of the Bankruptcy Code, which is to maximize the value of the assets and thereby maximize potential recovery to the creditors). This is a critical component of a bankruptcy sale because the Code's drafters understood the importance of maximizing a debtor's property value. They also understood that it was necessary to permit the bankruptcy trustee to have the flexibility to arrange a quick sale. And, to achieve a quick sale, it is necessary that the disposition of competing interests in the property not bog the sale down. These same interests apply not just to real property but to all other property interests sold in bankruptcy. As the Third Circuit specifically held in *In re Trans World Airlines, Inc.*, "to equate interests in property with only *in rem* interests … would be inconsistent with section 363(f)(3)." 322 F.3d at 290.

This broader and truer interpretation of the term "interest" applies to Coal Act premiums. In *Leckie*, the Fourth Circuit directly addressed Appellants' argument that Section 363(f) of the bankruptcy code cannot be used to extinguish future Coal Act tax assessments. As the *Leckie* court unequivocally stated, "even if [a buyer at a § 363 sale constitutes] a successor in interest, the Bankruptcy Court may extinguish Coal Act successor liability pursuant to 11 U.S.C. § 363(f)(5)." *Leckie*, 99 F.3d at 585.[5] That same reasoning is consistent with the modern (and correct) interpretation of Section 363(f)'s term "interests."[6]

---

[5] In addition to asserting that their claims are not interests in property within the meaning of Section 363(f), Appellants also assert that their claims are outside the scope of § 363(f)(5) because the Coal Act premiums are not interests on account of which they could be compelled to accept money satisfaction. This argument was also addressed in *In re Trans World Airlines, Inc*. There, the Third Circuit held that where an interest is "subject to

For all of these reasons, Appellants have not carried their burden of making a strong showing that they are likely to succeed on the merits.

### 3.    Successor in Interest

Another open question in this Circuit is whether an assets purchaser is in fact a "successor" under the Coal Act.  Appellants seem to assume that such purchasers will become successors, even though they are merely purchasing *some* of the Debtors' *assets*.  That assumption is misplaced.  "Under the traditional rule on corporate successorship liability, a corporation that acquires manufacturing assets from another corporation does not thereby assume the liabilities of the seller."  *Holland v. Williams Mountain Coal Co*., 256 F.3d 819, 824 (D.C. Cir. 2001). "When Congress seeks to establish broad rules of successor liability, it will do so on its own. … Under the Coal Act, it did not." *Holland*, 256 F.3d at 830 (Sentelle, J., concurring); *see id*. at 822 ("A party simply acquiring property of a firm in an arm's length transaction, and taking up its business activity, does not become the selling firm's 'successor in interest'" for

---

monetary valuation, the fifth condition had been satisfied." 322 F.3d at 291.  Because Coal Act premiums "are reducible to, and can be satisfied by, monetary awards," they fall within the scope of Section 363(f)(5).  *See In re Trans World Airlines, Inc*., 322 F.3d at 291.

[6] The Bankruptcy Code's definition of "claim" supports the broader reading of "interest" in Section 363(f). The Code defines "claim" as:

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, legal, equitable, secured, or unsecured;

> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5); *see also Epstein v. Official Comm. Of Unsecured Creditors of Estate of Piper Aircraft Corp.*, 58 F.3d 1573, 1576 (11th Cir. 1995) (citations omitted) ("Congress intended to define the term claim very broadly under § 101(5), so that 'all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case.'").  Coal Act premiums are a "right to payment," and, thus, are a "claim" that may be disposed under 11 U.S.C. § 363(f).  *Compare* 11 U.S.C. § 363(f)(5) (a free and clear sale of any interest of an entity may occur if "such entity could be compelled . . . to accept a money satisfaction of such interest") with 11 U.S.C. § 101(5)(A) ("The term 'claim' means right to payment . . . .").

Coal Act purposes).  On this question, Appellants have again fallen short of making a strong showing that they will succeed on the merits.

### 4.   Merely Raising Issues of First Impression Does Not Carry Appellants' Burden

Finally, Appellants assert that merely because the issues they have raised are important questions of first impression *in this Circuit*, it follows that they have met their burden on the first element to show that a stay is warranted.  The court agrees that the issues are ones of first impression in this Circuit.  But that is not enough to carry Appellants' burden of establishing that they have made a strong showing that they are likely to succeed on the merits under any reading of that test.  Moreover, the fact remains that at least one other Circuit to consider virtually these same issues has rejected arguments similar to those made by Appellants.  *Leckie*, 99 F.3d at 584–85.  The court understands that Appellants believe that the *Leckie* decision was wrongly decided.  Nevertheless, Appellants have not directed the court to *any* case that holds that the Coal Act prevents a sale free and clear of Coal Act premiums.  For that matter, Appellants have not directed the court to any cases expressly disagreeing with *Leckie*.[7]  The court understands that Appellants seek the opportunity to make new law; however, that alone does not carry their burden on the first element.  Simply put, the court concludes that Appellants have failed to make a strong showing that they are likely to succeed on the merits.

### B.   Irreparable Injury Absent a Stay

The second element in *Nken* requires Appellants to show that they will suffer an irreparable injury absent a stay.   *See Nken*, 556 U.S. at 434; *see also, e.g.*, *In re Whitaker*, 341 B.R. 336, 348 (Bankr. S.D. Ga. 2006); *cf. Thomas v. Heckler*, 598 F. Supp. 492, 497 (M.D. Ala.

---

[7] Appellants suggested at oral argument that the Fourth Circuit's holding in *Adventure Res., Inc. v. Holland*, 137 F.3d 786 (4th Cir.), *cert. denied* 525 U.S. 962 (1998), was at odds with *Leckie*.  But in *Adventure Res., Inc.*, the Fourth Circuit did not question the validity of (much less overrule) *Leckie*.

1984) (preliminary injunction context).  A showing of irreparable harm must be "neither remote nor speculative, but actual and imminent."  *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989) (citations omitted).  Some "possibility of irreparable injury" is not enough.  *Nken*, 556 U.S. at 434-35.  Further, "[m]ere injuries, however substantial, in terms of money, time, and energy necessarily expended in the absence of a stay, are not enough."  *In re Lickman*, 301 B.R. 739, 748 (Bankr. M.D. Fla. 2003) (quoting *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987)).  And, the overwhelming majority of courts, including those within the Eleventh Circuit, have recognized that possibility of mootness of an appeal "is insufficient by itself to establish irreparable injury."  *In re Charter Co.*, 72 B.R. 70, 72 (M.D. Fla. 1987), *aff'd* 829 F.2d 1054 (11th Cir. 1987).

Appellants argue that a stay pending appeal is necessary to protect their right and ability to appeal, because, without a stay, Section 363(m) will likely moot the appeal—if not outright, then at least equitably.  (Doc. # 17 at 4-5).  Specifically, Appellants assert that the Debtors currently pay Coal Act premiums in support of a total of 604 beneficiaries (32 in the Combined Fund and 572 in individual employer plans) and the obligations to make payments will be moved into the 1992 Plan if the individual employer plans are terminated.  (*Id.* at 9).  They argue that if the Sale Order is not stayed and the sale advances free-and-clear of the obligation to make Coal Act payments pursuant to the Sale Order, then the financial stability of the Coal Act Funds will be threatened because the purchasers will not pay future Coal Act liabilities.  (*Id.* at 9-10).  Neither the record in the Bankruptcy Court nor the record before this court supports that argument.  (*See, e.g.*, Doc. # 20-12 at pp. 39-49 (Bankruptcy Court's verbal findings and conclusions and denial of emergency stay motion)).

Moreover, with the Coal Act, "Congress sought to assign health care liability in a form that would be free from such unraveling" when a signatory operator to the Plans (*i.e.*, one incorporated into the Coal Act, such as the Debtors here), goes out of business. *Holland*, 256 F.3d at 821. In so doing, Congress designed the law so that if the Funds trustees "cannot compel payment to the last signatory operator, a related person, or a 'successor in interest,' the [Trustees] can adjust the premiums they charge employers obligated to contribute to the 1992 Plan." *Id.* (citing 26 U.S.C. § 9712(d)(2)(B); *see also* 26 U.S.C. § 9704(e)(3)(A)). Further, the Eleventh Circuit has recognized a statutory fallback for retirees under the Combined Fund. *See U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1276-77 (11th Cir. 2007) (citing 26 U.S.C. § 9706(a)). In *U.S. Steel Corp.*, the Eleventh Circuit discussed an assignment scheme under which the Social Security Administration is directed "to assign retirees to operators" based on a three-step formula, which in turn would assign funding for individual retirees to coal operators that were signatories to certain coal wage agreements and once employed the coal industry retiree. *U.S. Steel Corp.*, 495 F.3d at 1276-77. And, "[if] an eligible beneficiary cannot be assigned under any of these steps," the "unassigned" retiree's benefits "are funded through asset transfers from the 1950 National Bituminous Coal Wage Agreement Fund or the Abandoned Mine Land Reclamation Fund." *Id.* at 1277 (citing *Sidney Coal Co. v. Soc. Sec. Admin.*, 427 F.3d 336, 338 (6th Cir. 2005) (citing 26 §§ U.S.C. 9705(a)-(b))). "If asset transfers are insufficient, then the unassigned miners' benefits are funded through premiums assessed against all assigned operators." *Id.* (citing 26 U.S.C. § 9704(d)). Thus, in summary, Congress designed the Coal Act to protect against the "chance of the miners being denied their benefits" because of the bankruptcy of a coal operator such as the Debtors.[8] *Holland*, 256 F.3d at 821. Accordingly, the

---

[8] The Coal Funds seem to be concerned that funding is shrinking because the original signatories to the coal wage agreements (which were incorporated into the Coal Act) are diminishing alongside the present collapse of the

32 beneficiaries under the Combined Fund and the 572 beneficiaries who will go into the 1992 Plan when the sale closes should be adequately funded.

There are other facts in this case suggesting that Appellants are not facing irreparable harm if this sale order is not stayed. For example, the Debtors are current on their premium payments to the Coal Act Funds, and have in place $4.2 million in letters of credit that will pay premiums for a year. (Docs. # 20-2 at 124-25, 20-3). While this money may be less than what Debtors would have to pay in lieu of a sale (or what the purchasers may be required to pay if they assumed Coal Act liabilities), it provides a cushion against injury. *Cf. Leckie*, 99 F.3d at 586-87 (noting that "$1.9 million represented a fair and reasonable price for the debtors' assets; the debtors' accrued Coal Act obligations, though, stand at about $7 million. If a free and clear order could not be issued, the assets would almost inevitably have to be sold piecemeal, thereby generating fewer funds with which to satisfy the claims of the Fund, the Plan, and [others]").

The Funds have failed to carry their burden to show they will suffer irreparable harm if the stay is not granted. To the contrary, for the reasons discussed below in analyzing the third element of *Nken*, the Debtors, purchasers, and the bankruptcy estate itself will be irreparably harmed if a stay is granted.

### C.      Substantial Injury to Other Parties

The third prong of the *Nken* test requires the court to consider whether a stay will substantially injure other parties interested in the proceeding. *Nken*, 556 U.S. at 434. This court agrees with the following findings of the Bankruptcy Court:

---

coal market. This court is called upon to resolve many problems. But this is not one of them. Nor can it be. Any remedy for this concern must come from Congress, which can pass legislation addressing such economic realities (and all of the political decisions that are carried along with it) or the coal operators and UMWA, which can seek to negotiate for retiree benefits coverage with new coal operators (such as the purchasers of Debtors' assets).

Moreover, even assuming the total number of coal industry businesses that contribute to the Coal Funds is shrinking, if the stay is granted and the sale of Debtors' assets does not proceed, that portends the immediate collapse of Debtors and their operations and will only hasten the thinning of the pool.

> It is clear to this Court from the testimony and evidence offered at virtually every hearing that, without a sale, the mines will close and then shortly thereafter likely there would be – this would be followed by a conversion to Chapter 7. This result would be detrimental, prejudicial and cause substantial harm to every stakeholder and every party in interest in these cases, including the non-union retirees, the unsecured creditors, regulatory agencies that are depending on the buyer's assumption about various obligations with respect to their regulations, current employees who have a chance to retain their jobs, vendors who will have the opportunity to continue doing business with the mines if the sale is completed, the community near the mines who will suffer economically if there is no sale and the mines close.

(Doc. # 20-12 at 46-47); (*see also*, *e.g.*, Doc. # 20-8 (settlement with other stakeholders contingent on sale)); *See In re Gen. Motors*, 409 B.R. at 33 ("We're not talking about delaying distributions to creditors for a little longer. We're talking about the death of a company. If I or any other court were to grant the requested stay, GM would soon have to liquidate.").

The Asset Purchase Agreement sets forth that the sale is subject to termination if it is stayed. (*See* Doc. # 20-4). And, the Debtors report that the Senior Secured Lenders' commitment to extend a $50 million bridge loan to fund the Debtors' operations past mid-February 2016, pending the sale, is contingent on no stay being entered. (Docs. # 20-10, 29 at 21). Thus, if the Sale Order is expressly stayed, there is a substantial threat that the Debtors will be forced to cease business and the mines will close. In that eventuality, current mine workers and other employees will be out of work. No new collective bargaining agreements or retiree benefit plans could be negotiated. The Bankruptcy would convert to Chapter 7. The Debtors' assets would be liquidated. This potential cascade of events stands in stark contrast to the advantages brought forth by the proposed Sale.

Furthermore, even if a limited stay in theory might not cause irreparable harm to Debtors and the purchaser, Appellants are not entitled to a limited stay. Debtors' assert that they cannot secure the bridge loan needed to fund operations pending the sale if this court enters a stay, and

that they will go into liquidation.  The court recognizes that Appellants contend (and might even believe) that the lenders are not serious about this warning and admonition.  But that ignores two points—one factual and one legal.  Factually, the undisputed evidence before the court is that the creditors in this case have expressly conditioned the bridge loan funds and the act of sale on the Sale Order not being stayed.  Legally, it is Appellants -- not Appellees -- that bear the burden of showing irreparable injury here.

Appellants cannot carry their burden here by speculating concerning potential harm.  Nor is it proper for the court to engage in such rank speculation.  The fact is that the language of the Sale Order and the conditions of the current financing arrangement both indicate that the Debtors cannot secure the bridge loan funds if the sale is stayed and the Sale Order is subject to termination if the Sale Order is stayed.[9]  *Cf. Schlesinger*, 888 F.2d at 975 ("defendants' argument that there is no causal connection between the self-interested transactions and the danger of bankruptcy is specious").  The risks to Debtors, to their employees, and to the community are too real to order a stay, however limited, on pure speculation.  *See, e.g.*, *In re Gen. Motors Corp*, 409 B.R. 24, 32 (Bankr. S.D.N.Y. 2009) (stating in opinion and order dated July 7, 2009, "GM will lose its funding if approval of this transaction is not secured by July 10.  The U.S. Government is not willing to keep funding GM while creditors block the 363 transaction to improve upon their individual recoveries.   The only alternative to an immediate sale is liquidation"); *cf. also Schlesinger*, 888 F.3d at 975 ("Defendants urge that the danger of bankruptcy is speculative because Schlesinger would not rationally decide to demand payment because of his personal liability for Adson's debts.  Although appealing on the surface, this argument upon reflection

---

[9] The court is aware that Appellants complain that Appellee has not provided specific evidence expressly showing that funding will be withdrawn if a stay is entered.

ignores Adson's precarious financial situation and Chemical Bank's ability to demand immediate payment of its $1,370,000 loan.  That shaky situation provides ample incentive . . . .").

This court also agrees with the Bankruptcy Court's assessment that "the purchaser [Coal Acquisition, LLC] who has already expended money for startup costs, has already start[ed] arranging for financing or funding of certain out-of-pocket expenses" and would be harmed if the sale is stayed—particularly because the sale may not close if it is stayed.  (Doc. # 20-12. at 47).  Moreover (and this is ironic in light of its positon on this appeal), the UMWA itself would suffer if the sale is stayed.  "If there is no sale and if this Court were to grant the stay today, then the sale would be derailed and certainly Coal Acquisition would cease any and all negotiations with the union with respect to a new CBA."  (*Id.*).  Judge Mitchell is right.  If the stay is granted and the sale does not close, the record evidence supports a finding that the mines would close and the UMWA members who worked in Debtors' mines would be out of work entirely.

Appellants have not carried their burden to show that denial of a stay would result in substantial injury to other parties.

### D.    The Public Interest

Finally, in contemplating a stay, this court must also determine where the public interest lies.  *Nken*, 556 U.S. at 434.  This court again adopts the conclusion of the Bankruptcy Court, which found that "granting the stay …, based on the testimony and evidence, would jeopardize the sale," and thus "would not serve the public interest."  (Doc. # 20-12 at p. 47).   Based on all of the evidence before it, the Bankruptcy Court determined that "the public interest is served by the conclusion of the sale as soon as practicable."  (*Id.*).  *See In re Gen. Motors*, 409 B.R. at 33 ("[W]ith the death of GM on the line, the damage to the public interest would be irreparable.").

The Bankruptcy Court's findings and conclusions correctly and appropriately underscored the critical importance of keeping the Debtor's mines open.

> The public interest is, again, the community, the -- keeping the mines open. Keeping the mines open ensures continued revenues to local and state governmental agencies, ensures proper reclamation and other compliance with the regulatory agency and that certainly serves the public. And the sale is more likely to ensure that result than closing the mines.

(*Id.* at p. 48).

This is not to suggest that Appellants have articulated no public benefit that *may* occur if a stay is granted. But the benefits pointed to by Appellants are either theoretical or, in any event, insufficient to order a stay.

Hypothetically, if the court stayed the sale and Appellants thereafter succeeded on their appeal, federal dollars (that is, taxpayer money and/or funds presently statutorily earmarked for other uses) may be saved. It may be that a purchaser (if one still existed) would be willing to contribute premiums toward the Coal Act Funds instead of using taxpayers' funds to bail out the Funds. Of course, "[t]he public … has a strong interest in ensuring that the Coal Act Funds are well-financed and able to provide for the healthcare needs of retired coal miners and their dependents." (Doc. # 17 at 13).

In its calculus, the court has accounted for each of these theoretical benefits. Nevertheless, on balance they pale in comparison to the actual benefits that the Debtors, creditors, and virtually everyone else would realize if a stay is denied. Similarly, any potential benefits realized by a stay would come at great cost. If the sale is stayed and never closes, the collapse and subsequent liquidation of Debtors' assets will harm the funding of the Coal Act

Funds, the Debtors will no longer exist, the purchasers will walk away, and no one will make any contributions to the Funds.[10]

Appellants have the burden of proving the public interest supports a stay.  They have failed to meet that burden.  "Here the public interest does not favor a stay; it compels the denial of one." *In re Gen. Motors*, 409 B.R. at 33.

## III.    Conclusion

Based on the foregoing reasons, the court concludes that Appellants have not met their heavy burden of showing that the sale should be stayed.  Accordingly, the Emergency Motion for a Stay Pending Appeal (Doc. # 16) is due to be denied.  A separate order will be entered.

**DONE** and **ORDERED** this February 8, 2016.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

---

[10] The court understands that there may be some environmental benefits associated with the proper closure of the mines and reclamation of the mining sites.  But even then, there is no guarantee that the moneys Debtors have reserved for closure (if the bridge loan falls through and the sale does not close) will be wholly sufficient to accomplish proper reclamation.

19