# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED MINE WORKERS OF AMERICA COMBINED BENEFIT FUND, et al., | } } } } | |
| Appellants, | } } | Case No.: **2:16-cv-00064-RDP** |
| v. | } } | |
| WALTER ENERGY, INC., et al., | } } | |
| Appellees. | } | |

## MEMORANDUM OPINION

### I.    Introduction

This case is before the court on an appeal from the United States Bankruptcy Court for the Northern District of Alabama's January 8, 2016 Order (I) Approving the Sale of the Acquired Assets Free and Clear of Claims, Liens, Interests and Encumbrances; (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief (the "Sale Order") (Doc. # 1-3, or Doc. # 15-3 at A235-265).  Appellants raise arguments in this appeal regarding the jurisdiction of the Bankruptcy Court and the reach of 11 U.S.C. § 363(f).  Specifically, this court must determine the following two questions:

1. Whether the Bankruptcy Court had jurisdiction to order a free and clear sale pursuant to 11 U.S.C. § 363(f) precluding the purchaser of the Debtors' assets from future liability for payments made under the Coal Industry Retiree Health Benefit Act, 26 U.S.C. §§ 9701-9722 (the "Coal Act").

2. Whether future Coal Act liabilities for periods after the closing of the asset sale pursuant the Sale Order constitute "interests in . . . property" that may be extinguished under 11 U.S.C. § 363(f).

This appeal is fully briefed (Docs. # 15, 39, 40, 44), and the relevant record has been transmitted (Docs. # 15, 39, 44).  Because the court held extensive oral argument concerning the "merits" of this appeal during the February 1, 2016 hearing in connection with Appellants' Emergency Motion for a Stay Pending Appeal, the court has determined oral argument is not necessary to decide this case.  (Doc. # 29).  For the following reasons, this court concludes that the Bankruptcy Court had jurisdiction to order a sale free and clear of Coal Act payments pursuant to 11 U.S.C. § 363(f).  Accordingly, the Bankruptcy Court is due to be affirmed.

## II.    Background and Proceedings Below

The Sale Order applies to certain of Debtors' assets and would prevent the proposed purchaser, Coal Acquisition LLC, from assuming Coal Act liabilities for those assets.

### A.    The Coal Act

The Coal Act applies to Debtors.  This court has previously addressed the origin and purpose of the Coal Act:

> The Coal Act requires present and former coal operators, such as the plaintiffs in this case, to pay for the health benefits of coal industry retirees and their dependents.  26 U.S.C. §§ 9702, 9704.  Congress passed the Coal Act in 1992 to ensure that retired coal miners and their dependents and widows continue to receive the lifetime health benefits guaranteed by earlier collective bargaining agreements with coal operators.  Before the Coal Act was passed, the two multi-employer health care plans that provided benefits to retired miners (the "Plans") were operating at a deficit. The financial instability of the Plans led to a breakdown in labor relations, the cessation of operator contributions to the Plans, and an eleven-month strike by mine workers.  *National Coal Association v. Chater*, 81 F.3d 1077, 1078-79 (11th Cir. 1996).  In an effort to remedy the funding problems yet maintain a privately financed program, Congress consolidated the Plans into the Combined Fund with financing primarily provided by coal operators.

*AJ Taft Coal Co., Inc. v. Barnhart*, 291 F. Supp. 2d 1290, 1295 (N. D. Ala. 2003).  In addition to the Combined Fund, the Coal Act established the 1992 Plan (together the "Coal Act Funds").  26 U.S.C. § 9712.  The 1992 Plan provides benefits to two groups of retired coal miners: (1) those

otherwise eligible for Combined Fund benefits, but who retired after the cut-off date, and (2) those whose former employers have failed to provide benefits under individual employer plans ("IEPs").  *Id.*  Any employer who provided healthcare benefits to retirees through an IEP as of February 1, 1993, must continue to do so for as long as the employer remains in business.  *Id.* at § 9711(a).

The Coal Act Funds are funded primarily through statutorily required "premiums."  26 U.S.C. §§ 9704, 9711, 9712.  Combined Fund premiums are assessed against "assigned operators," and those assigned operators' related persons and successors in interest are jointly and severally liable.  *See id.* at §§ 9701(c), 9704(a), 9706.  The amount of the Combined Fund assessment fluctuates annually, depending on the number of retirees and the premium rate set by the Commissioner of Social Security.  *Id.* at § 9704(a)-(b), (g).  Under the 1992 Plan, Premiums are assessed monthly against "last signatory operators" (the most recent coal industry employers of the retirees, including "related persons" and their successors in interest) based on the number of 1992 Plan beneficiaries assigned to that last signatory operator.  *Id.* at §§ 9701(c), 9711(g), 9712(d)(2)-(4).  If these funding schemes prove insufficient, Congress has created means for addressing shortfalls in Coal Act Funds premiums to be paid.  *See U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1276-77 (11th Cir. 2007) (explaining statutory backstop for retirees under Combined Fund); 26 U.S.C. § 9712 (allowing for transfer of moneys from other statutorily created Funds).  Congress designed the Coal Act to protect against the "chance of the miners being denied their benefits" if an employer or signatory to a covered Plan goes bankrupt.  *Holland v. Williams Mountain Coal Co.*, 256 F.3d 819, 821 (D.C. Cir. 2001).

### B.        The Walter Energy Bankruptcy and the Sale Order

Debtors—that is, Walter Energy and twenty-two affiliated companies (collectively, "Walter Energy")—produce and export metallurgical coal for the global steel industry, with mineral reserves in the United States, Canada, and the United Kingdom.  *In re Walter Energy, Inc.*, 542 B.R. 859, 866 (Bankr. N.D. Ala. 2015) (the "1113/1114 Order").[1]  Walter Energy also extracts, processes, and markets thermal and anthracite coal and produces metallurgical coke and coal bed methane gas."  *Id.*  The No. 4 and No. 7 mines at Jim Walter Resources, Inc. (one of Walter Energy's affiliated companies) are "the heart of the Debtors' operations."  *Id.*

On July 15, 2015, due to market forces, Walter Energy was compelled to file petitions for relief under Chapter 11 of the Bankruptcy Code.  *In re Walter Energy*, 542 B.R. at 866.  After unsuccessfully attempting Chapter 11 restructuring, Walter Energy marketed its assets in anticipation of a sale pursuant to Section 363 of the Bankruptcy Code.  *Id.* at 870-72.  There was only one potential buyer.  "After two months of negotiations, . . . Debtors executed an asset purchase agreement . . . with Coal Acquisition, LLC, an entity owned by the First Lien Creditors."[2]  *Id.* at 870.  (*See also* Doc. # 39-4 at A1395-1521).  Coal Acquisition agreed to purchase Walter Energy's core Alabama mining operations for consideration including a $1.15 billion credit bid by the lenders and an additional $185.5 million in cash, trust funding, and assumed liabilities.  *In re Walter Energy*, 542 B.R. at 869-70.  But, Coal Acquisition would only purchase certain of Debtors' assets if they were free and clear of legacy and current labor costs,

---

[1] The 1113/1114 Order is also available at Doc. # 15-3 at A266-322.

[2] "A 'stalking horse' contract is a first, favorable bid strategically solicited by the bankrupt company to prevent low-ball offers."  *In re WestPoint Stevens, Inc.*, 600 F.3d 231, 239 n. 3 (2d Cir. 2010).  In the Bankruptcy Court, Coal Acquisition was a "stalking horse bidder"; however, because no other bids were made for the purchase of Debtors' assets, it became the "Stalking Horse Purchaser."  *See In re Walter Energy*, 542 B.R. at 869-72.  (*See also* Doc. # 1-3).  .

4

and all claims, liens, interests and encumbrances, including the assumption of Coal Act payment

responsibilities. *Id.* at 870; (Docs. # 15-4 at A428-555); (Doc. # 1-3).

 After motions and briefing, the Bankruptcy Court issued the 1113/1114 Order on

December 28, 2015, and the Sale Order on January 8, 2016.[3]  (Docs. # 15-3 at A266-322, 1-3).

The Sale Order provides in pertinent part:

> 6. Upon the Closing: (a) the Debtors are hereby authorized and directed to
> consummate, and shall be deemed for all purposes to have consummated, the sale,
> transfer and assignment of all of the Debtors' rights, title and interest in the
> Acquired Assets to the Stalking Horse Purchaser free and clear of all
> Encumbrances and Liabilities, other than the Assumed Liabilities and the
> encumbrances identified on Schedule I hereto . . .; and (b) except as otherwise
> expressly provided in the Stalking Horse Agreement, all Encumbrances and
> Liabilities (other than the Assumed Liabilities and the Permitted Encumbrances)
> shall not be enforceable as against the Stalking Horse Purchaser or the Acquired
> Assets.  Unless otherwise expressly included in the Assumed Liabilities and
> Permitted Encumbrances or as otherwise expressly provided by this Order, the
> Stalking Horse Purchaser shall not be responsible for any claims, liens, interests
> and encumbrances, including in respect of the following: (i) any labor or
> employment agreements; . . . (v) any other employee, worker's compensation,
> occupational disease or unemployment or temporary disability related claim,
> including, without limitation, claims that might otherwise arise under or pursuant
> to . . . (k) the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§
> 9701, et seq. or (l) any other state or federal benefits or claims relating to any
> employment with the Debtors or any of their predecessors; . . . (ix) the Coal Act.
>
>    .  .  .  .
>
> 17. Upon the Closing, except as specifically included in Assumed Liabilities,
> the Stalking Horse Purchaser shall not and shall not be deemed to: (i) be the
> successor of or successor employer . . . to the Sellers, including without
> limitation, with respect to any Collective Bargaining Agreements and any Benefit
> Plans, except for Buyer Benefit Plans, under the Coal Act, and any common law
> successorship liability in relation to the UMWA 1974 Pension Plan, including
> with respect to withdrawal liability; . . . (iv) be a mere continuation or substantial
> continuation of Sellers or the enterprise(s) of Sellers. . . .

(Doc. # 1-3).  The Bankruptcy Court ordered that Debtors are not subject to any stay of the Sale

Order.  (*Id.*).  The parties informed this court that the sale of certain of Debtors' assets will occur

---

[3] The 1113/1114 Order is of limited relevance here.

sometime around the end of February or early March 2016.  (*See* Docs. # 29).  The court has recently been informed the sale date has been moved back to later in March 2016.

## III.    Procedural History

Shortly after the Bankruptcy Court issued the Sale Order on January 8, 2016, Appellants unsuccessfully moved in that court for an emergency stay.  (Doc. # 20-12).  Subsequently, both Appellants and the United Mine Works of America ("UMWA") appealed the Bankruptcy Court's Sale Order and 1113/1114 Order, and moved for an emergency stay of the sale Order. (Docs. # 1, 16); *see also* case nos. 2:16-cv-56-RDP, 2:16-cv-57-RDP, 2:16-cv-65-RDP.  This court denied a stay, but granted an expedited briefing schedule for this appeal.[4]  (Docs. # 19, 36). (After this court denied Appellants and the UMWA's Motions for Stay, UMWA withdrew its appeals without prejudice.  *See* Case Nos. 2:16-cv-56-RDP (Doc. # 27), 2:16-cv-65-RDP (Doc. # 32)).  Accordingly, this court is left with Appellants' present appeal, and a similar one appealing the 1113/1114 Order.  (*See* 2:16-cv-57-RDP).

## IV.    Standard of Review

A district court reviews the Bankruptcy Court's decision for abuse of discretion.  *In re Hillsborough Holdings*, 127 F.3d 1398, 1401 (11th Cir. 1997); *Steele v. Heard*, 487 B.R. 302, 307 (S.D. Ala. 2013).  Thus, when a district court hears an appeal from a bankruptcy court, its job is not to make independent factual findings; rather, the task of fact finding is the purview of the bankruptcy court.  *See* Fed. R. Bankr. P. 7052; *In re Sublett*, 895 F.2d 1381, 1384 (11th Cir. 1990).  This court will overturn the Bankruptcy Court's factual findings only if they are "clearly erroneous."  *Hillsborough Holdings*, 127 F.3d at 1401.  Factual findings are clearly erroneous if the court is "left with the definite and firm conviction that the [bankruptcy] court erred."  *In re*

---

[4] Appellants' motions in the Eleventh Circuit for a writ of mandamus and to stay the sale pending appeal were also denied.  (Docs. # 49, 51).

*Walker*, 515 F.3d 1204, 1212 (11th Cir. 2008) (citation and internal quotation marks omitted). Of course, this court reviews *de novo* a bankruptcy court's legal conclusions. *In re Tennyson*, 611 F.3d 873, 875 (11th Cir. 2010) (citation omitted); *Consumer Portfolio Servs. v. Coleman*, 342 B.R. 817, 819 (N.D. Ala. 2006).

## V.    Analysis

The court has carefully reviewed the Bankruptcy Court's extensive factual findings and determines that they are not "clearly erroneous." *Hillsborough Holdings*, 127 F.3d at 1401. Accordingly, the court will not disturb those findings of fact.

The real issue in this case is whether *de novo* review indicates that the Bankruptcy Court had the authority to order a sale free and clear of Coal Act assessments. *In re Tennyson*, 611 F.3d 873, 875 (11th Cir. 2010). Appellants contend the Bankruptcy Court lacked jurisdiction to order a free and clear sale of Coal Act premiums due to the Tax Anti-Injunction Act, and because Coal Act premiums are not "interests . . . in property" extinguishable under 11 U.S.C. § 363(f). Further, while not specifically raised as an issue on appeal, Appellants presuppose that Coal Acquisition is a successor in interest to the Debtors for purposes of the Coal Act, and, thus, the Bankruptcy Code cannot be used to circumvent Coal Act requirements. This court concludes that Appellants' arguments do not win the day because the Bankruptcy Court had both jurisdiction and legal authority to order a sale free and clear of future Coal Act liabilities, and is due to be affirmed.

### A.    The Tax Anti-Injunction Act Does Not Preclude the Bankruptcy Court's Jurisdiction

Appellants argue that the Tax Anti-Injunction Act (the "Tax AIA") is a jurisdictional bar to the Bankruptcy Court's order of a sale free and clear of future Coal Act payments because

those payments are in fact taxes.  However, Coal Act payments are not "taxes" for purposes of the Tax AIA, and the Bankruptcy Court had jurisdiction to enter the Sale Order.

The Tax AIA withdraws from federal courts' subject-matter jurisdiction the power to "restrain[] the assessment or collection of any tax."[5]  26 U.S.C. § 7421(a).  The Supreme Court "has interpreted the principal purpose of this language to be the protection of the Government's need to assess and collect taxes as expeditiously as possible with a minimum of preenforcement judicial interference, 'and to require that the legal right to the disputed sums be determined in a suit for refund.'"  *Bob Jones Univ. v. Simon*, 416 U.S. 725, 736 (1974) (citations omitted).  A "collateral objective" of the Tax AIA is to protect the "collector from litigation pending a suit for refund."  *Id.* (citation omitted).  The statute applies to "any tax" and precludes attempts to impede the raising of revenues to fund governmental and government-sponsored endeavors. *Alexander v. Ams. United Inc.*, 416 U.S. 752, 760 (1974).

The Eleventh Circuit has not yet had the occasion to address whether Coal Act assessments are taxes or, alternatively, should be given some different characterization.  This court recognizes that there are courts outside our circuit which have found that the payments at issue under the Coal Act should be construed as "taxes."  *See, e.g., UMWA 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573, 583 (4th Cir. 1996), *cert. denied,* 520 U.S. 1118 (1997); *Adventure Res. Inc. v. Holland*, 137 F.3d 786, 794 (4th Cir. 1998) (concluding that Coal Act contributions should be treated as taxes under a provision of the Bankruptcy Code); *United Mine Workers of Am. 1992 Benefit Plan v. Rushton (In re Sunnyside Coal Co.)*, 146 F.3d 1273, 1280 (10th Cir. 1998) (same); *LTV Steel Co. v. Shalala (In re*

---

[5] Similarly, the Declaratory Judgment Act places a limitation on a court's ability to grant declaratory relief concerning the assessment of taxes.  28 U.S.C. § 2201(a) ("In a case of actual controversy within its jurisdiction, except with respect to Federal taxes . . ., any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration . . . .").

*Chateaugay Corp.*), 53 F.3d 478, 498 (2d Cir. 1995) (same); *Lindsey Coal Mining Co. v. Chater*, 90 F.3d 688, 695 (3d Cir. 1996) (agreeing with the district court's statement that the Coal Act "assesses what is essentially a tax to continue a benefits program").  But those decisions from the 1990s reached that conclusion without the benefit of the Supreme Court's ruling in *National Federation of Independent Business v. Sebelius*, -- U.S. --, 132 S. Ct. 2566 (2012) ("*NFIB*"). The *NFIB* Court observed that, because "[i]t is up to Congress whether to apply the [Tax] Anti–Injunction Act to any particular statute, . . . it makes sense to be guided by Congress's choice of label on that question."  *NFIB*, 132 S. Ct. at 2594.  Based upon this tautological principle, the Court concluded that Congress's choice to label the Patient Protection and Affordable Care Act's individual mandate "as a 'penalty,' not a 'tax'," was "fatal to the application of the [Tax] Anti–Injunction Act" to that "penalty."  *Id*. Similarly, and applying the rationale of *NFIB* here, the court concludes that, in the Coal Act context, Congress's characterization of the payments at issue as "premiums," not taxes, is "fatal to the application of the [Tax] Anti–Injunction Act."  *NFIB*, 132 S. Ct. at 2594; *see* 26 U.S.C. § 9704(a) – (j); 26 U.S.C. §  9712(d)(1)(A).

Appellants argue that Coal Act premiums "are involuntary assessments, defined by the Internal Revenue Code, assessed periodically, and paid to further a congressional purpose."  (*See* Doc. # 15 at 6).  An assessment such as Coal Act premiums may be a tax in the constitutional sense, but be outside of the statutory grasp of the Tax AIA.  The Supreme Court has defined taxes as "pecuniary burdens laid upon individuals or their property, regardless of their consent, for the purpose of defraying the expenses of the government or of undertakings authorized by it."  *City of New York v. Feiring*, 313 U.S. 283, 285 (1941).  "It is true that Congress cannot change whether an exaction is a tax or a [premium] for *constitutional* purposes simply by describing it as one or the other."  *NFIB*, 132 S. Ct. at 2583 (emphasis in original).  And, indeed, the Coal Act is

located in Title 26 of the United States Code, and Coal Act premiums are "pecuniary burdens laid upon individuals or their property, regardless of their consent, for the purpose of defraying the expenses of the government or of undertakings authorized by it"—that is, the benefits of retired coal miners. *Feiring*, 313 U.S. at 285. However, in terms of the Tax AIA's application, not all taxes are created equal. "Congress can, of course, describe something as a [premium] but direct that it nonetheless be treated as a tax for purposes of the [Tax] Anti-Injunction Act." *NFIB*, 132 S. Ct. at 2583. However, Congress has not directed such treatment when it comes to the Coal Act. Indeed, how the Tax AIA relates to the Coal Act—both of which are "creatures of Congress's own creation"—"is up to Congress, and the best evidence of Congress's intent is the statutory text." *NFIB*, 132 S. Ct. at 2583.[6]

The court agrees that in *NFIB* the Supreme Court did not endorse a formalistic, label-driven approach to the Tax AIA. But this application of *NFIB* and the conclusions reached here are not only consistent with the Supreme Court's teachings in that decision, they also make legal sense for other reasons. At its core, the Coal Act essentially functions akin to a funding mechanism for a multi-employer benefit plan, not as a taxing scheme. For federal income tax purposes, it allows a coal company to take tax deductions for its Coal Act premiums just as it would for contributions to a multi-employer benefit plan. *See* 26 U.S.C. §§ 9704(g)(2), 9712(d)(5). The assessments are made and received by a private, non-governmental trust (Appellants). The funds are used to pay for health and welfare benefits of retired mine workers who previously worked for private businesses. In any way material to their characterization, the assessments are treated no differently than ERISA or Multi-employer Benefit Plans.

---

[6] *But see Leckie*, 99 F.3d at 583 (holding that Coal Act premiums are "taxes" for purposes of the Tax AIA). The court notes that, in its view, *Leckie* and the other 1990s cases addressing whether Coal Act premiums are taxes were correctly decided based upon the existing legal landscape. But the *NFIB* decision changed the calculus.

Enforcement, if necessary, is executed by the same private group which assesses the premiums. *See* 26 U.S.C. § 9721. All of this points to a straight-forward conclusion — the Coal Act was not designed to raise revenue to fund governmental or government-sponsored endeavors.

But even if the court viewed the Coal Act's treatment of premiums and the intervening *NFIB* decision differently, and even assuming further that Coal Act premium payments are in fact taxes, the same result would be reached here. Appellants' Tax AIA argument has previously been rejected by the only Circuit to consider that precise issue. In *Leckie*, the Fourth Circuit held that "the [Tax] Anti–Injunction Act 'was not intended to bar an action where . . . Congress has not provided the plaintiff with an alternative legal way to challenge the validity of a tax.'"[7] *Leckie*, 99 F.3d at 584 (ellipsis in original) (quoting *South Carolina v. Regan*, 465 U.S. 367, 370–71 (1984)). In all relevant respects, *Leckie* is squarely on point with the issues before this court.[8]

In *Leckie*, bankrupt coal operators sought to secure a declaration from the bankruptcy court that the purchasers of their assets would not be liable for Coal Act premiums as potential successors-in-interest to the bankrupt coal operators. The Fourth Circuit concluded that, at least before the act of sale, the bankrupt coal operators "[did] not have any 'alternative legal way' to challenge the imposition of Coal Act successor liability on the purchasers of their assets." *Id*. The *Leckie* operators and the potential purchasers "need[ed] to know whether they [could] sell their assets free and clear of liability for their Coal Act premiums." *Id*. Thus, the debtor/coal

---

[7] Appellants argue that *Leckie* is bad law because it relies on an exception to the Tax AIA, and judges may not craft exceptions to the Tax AIA. (Docs. # 15, 44). But this argument ignores the Supreme Court's own findings of exceptions to the Tax AIA, and the Eleventh Circuit's recent recognition of those exceptions. *See, e.g.*, *Gulden v. United States*, 287 Fed. Appx. 813, 817-18 (11th Cir. 2008) (*per curiam*) (citing *Enochs v. Williams Packing*, 370 U.S. 1 (1962)).

[8] While the *Leckie* court (among others) found that Coal Act payments were taxes, that ruling was made without the benefit of the Supreme Court's *NFIB* decision. This court concludes *NFIB* would change only that single holding of *Leckie*, but would not alter the ultimate holding and outcome of the *Leckie* decision.

operators sought a declaration regarding what responsibility, if any, the potential purchasers would have to make Coal Act premium payments.  The Fourth Circuit held that neither the Tax AIA nor the Declaratory Judgment Act precluded the bankruptcy court from considering the merits because "the Coal Act [does not] provide any means by which a coal operator can challenge the imposition of successor liability on a third party."  *Id*.

Accordingly, for all these reasons the Tax AIA does not operate as a bar to the Sale Order.  The Bankruptcy Court had jurisdiction to order a sale free and clear of future Coal Act assessments.

### B.    Coal Act Premiums Are Extinguishable under Section 363(f)

A bankruptcy court has the power to approve the sale of a debtor's assets free and clear of any interest or claims that could be brought against the bankrupt estate during a bankruptcy. 11 U.S.C. § 363(f); *see In re Odes Ho Kim*, 748 F.3d 647, 654-55 (5th Cir. 2014); *Al Perry Enterprises, Inc. v. Appalachian Fuels, LLC*, 503 F.3d 538, 543 (6th Cir. 2007).  Appellants argue that the term "interests" as used in Section 363(f) should be interpreted to exclude future Coal Act assessments.  The court disagrees.

Section 363(f) of the Bankruptcy Code authorizes a bankruptcy sale of property "free and clear of any interest in such property."  11 U.S.C. § 363(f).  Section 363(f) reads as follows:

> The trustee may sell property . . . free and clear of any interest in such property of an entity other than the estate, only if—
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  So long as one of the five conditions provided by Section 363(f) applies to Coal Act premiums, the Bankruptcy Court had the authority to order a free and clear sale.  The court concludes that the Bankruptcy Court had the authority under Sections 363(f)(1) and (5) to order the free and clear sale.

Section 363(f)(5) applies here because "[n]otwithstanding the question of price, it is clear that each and every [Appellant] herein 'could be compelled, in a legal or equitable proceeding, to accept the money satisfaction of their interest.'"  *In re 18th Ave. Dev. Corp.*, 14 B.R. 862, 863-64 (Bankr. S.D. Fla. 1981) (quoting 11 U.S.C. § 363(f)(5)).  Section 363(f)(1) also applies in this case because nothing in the Coal Act prohibits sale of an employer's property free and clear of Coal Act interests.  (*See* Doc. # 29 at 51-53 (counsel for Appellants describing agreements with asset purchasers that those purchasers "would not be obligated under the Coal Act")).

Of course, it follows that Section 363(f) can only apply if Coal Act premiums are indeed interests in Debtors' property.  Appellants urge a narrow reading of Section 363(f).  Their argument goes like this: Section 363(f) applies only to *in rem* interests, Coal Act premiums are not *in rem* interests, and therefore Section 363(f) has no application here.  As explained below, that argument misses the mark.

To be sure, a minority of courts have narrowly interpreted the term "interests in property" as used in Section 363(f) to mean *in rem* interests in property, such as liens.  *See, e.g., In re White Motor Credit Corp.*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("General unsecured claimants including tort claimants, have no specific interest in a debtor's property. Therefore, Section 363 is inapplicable for sales free and clear of such claims."); *In re New England Fish*

*Co.*, 19 B.R. 323, 326 (Bankr. W.D. Wash. 1982) (same).  But while a minority of courts initially interpreted the phrase "interest in such property" in this narrow way, Section 363(f) has more often (and more correctly) been given a broad reading to effectuate the purposes of the Bankruptcy Code.  *See Mich. Empt. Sec. Commn. v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132 (6th Cir. 1991); *Leckie*, 99 F.3d at 582; *In re Trans World Airlines, Inc.*, 322 F.3d 283, 289–90 (3d Cir. 2003); *In re Chrysler LLC*, 576 F.3d 108, 112 (2d Cir.) *cert. granted, judgment vacated sub nom. Indiana State Police Pension Trust v. Chrysler LLC*, 558 U.S. 1087, 130 S. Ct. 1015, 175 L. Ed. 2d 614 (2009) a*nd vacated sub nom. In re Chrysler*, LLC, 592 F.3d 370 (2d Cir. 2010).  Indeed, "the 'modern trend' of bankruptcy courts [is] to ascribe a broad meaning to the term 'any interest' as used in § 363."  *In re PBBPC, Inc.*, 484 B.R. 860, 867 (B.A.P. 1st Cir. 2013).   This more expansive reading of "interests in property" also "encompasses other obligations that may flow from ownership of the property."  *In re Trans World Airlines, Inc.*, 322 F.3d at 291 (3d Cir. 2003) (citing 3 Collier on Bankruptcy ¶ 363.06[1]).

Although the Eleventh Circuit has not yet spoken to it directly, the "more expansive reading of the term 'any interest'" has been approved by the First, Second, Third, Fourth, and Seventh Circuits.  *In re PBBPC, Inc.*, 484 B.R. at 869.  As the First Circuit has noted, this broad interpretation is more consistent with the language of the Bankruptcy Code, and is consistent with the general policy of the Bankruptcy Code to maximize the value of the bankruptcy estate.  *Toibb v. Radloff*, 501 U.S. 157, 163 (1991); *cf. also In re Egidi*, 386 B.R. 884, 893 (Bankr. S.D. Fla. 2008) (citing *Begier v. IRS*, 496 U.S. 52, 58-59 (1990) (other citations omitted) (stating that "property of the estate" defined in 11 U.S.C. § 541 "should be interpreted broadly").   An expansive interpretation of the term "interest in property" that can be cut off by a "free and clear" order under Section 363(f) promotes that policy by, *inter alia*, maximizing the value of the

assets that are being sold.  *See Douglas v. Stamco*, 363 Fed. Appx. 100, 102–03 (2d Cir. 2010) (the potential chilling effect of not allowing sales of assets free and clear of interests subsequent to the sale would run counter to a core aim of the Bankruptcy Code, which is to maximize the value of the assets and thereby maximize potential recovery to the creditors).  This is a critical component of a bankruptcy sale because the Code's drafters understood the importance of maximizing a debtor's property value.  They also understood that it was necessary to permit the bankruptcy trustee to have the flexibility to arrange a quick sale.  And, to achieve a quick sale, it is necessary that the disposition of competing interests in the property not usurp the sale.  These same interests apply not just to real property but to all other property interests sold in bankruptcy.  As the Third Circuit specifically held in *In re Trans World Airlines, Inc.*, "to equate interests in property with only *in rem* interests . . . would be inconsistent with section 363(f)(3)." 322 F.3d at 290.

This broader and truer interpretation of the term "interest" applies to Coal Act premiums. In *Leckie*, the Fourth Circuit directly addressed Appellants' argument that Section 363(f) of the bankruptcy code cannot be used to extinguish future Coal Act tax assessments.  As the *Leckie* court unequivocally stated, "even if [a buyer at a § 363 sale constitutes] a successor in interest, the Bankruptcy Court may extinguish Coal Act successor liability pursuant to 11 U.S.C. § 363(f)(5)."  *Leckie*, 99 F.3d at 585.[9]  That same reasoning is consistent with the modern (and

---

[9] In addition to asserting that their claims are not interests in property within the meaning of Section 363(f), Appellants also assert that their claims are outside the scope of § 363(f)(5) because the Coal Act premiums are not interests on account of which they could be compelled to accept money satisfaction.  This argument was also addressed in *In re Trans World Airlines, Inc*.  There, the Third Circuit held that where an interest is "subject to monetary valuation, the fifth condition had been satisfied."  322 F.3d at 291.  Because Coal Act premiums "are reducible to, and can be satisfied by, monetary awards," they fall within the scope of Section 363(f)(5).  *See In re Trans World Airlines, Inc*., 322 F.3d at 291.

correct) interpretation of Section 363(f)'s term "interests."[10]   Accordingly, the court concludes that the Bankruptcy Court had the legal authority under section 363(f) to extinguish future Coal Act payments because they are "interests" Debtors' property.

**C.    Coal Acquisition Is Not a Successor in Interest to Debtors' Coal Act Liabilities**

Appellants did not specifically raise as an issue for appeal whether Coal Acquisition would be a successor in interest to the assets of Debtors that it purchases.  They argued at the hearing for their emergency motion to stay that this determination cannot be made until after the sale closes and Coal Acquisition's business activities are examined.  (Doc. # 29 at 63, 97). Nevertheless, Appellants' arguments in this appeal presuppose that Coal Acquisition would be Debtors' successor in interest simply by virtue of purchasing *some* of Debtors' *assets*.  While the Eleventh Circuit has yet to expressly answer this question, this court concludes Appellants' assumption is misplaced.

A review of the purchase agreement makes clear that the transaction at issue is an assets purchase.  As the court noted in *Leckie*, there is at best an open question as to whether a Section 363(f) asset buyer is actually a "successor in interest" subject to Coal Act obligations.  *Leckie*, 99

---

[10] The Bankruptcy Code's definition of "claim" supports the broader reading of "interest" in Section 363(f). The Code defines "claim" as:

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, legal, equitable, secured, or unsecured;

> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5); *see also Epstein v. Official Comm. Of Unsecured Creditors of Estate of Piper Aircraft Corp.*, 58 F.3d 1573, 1576 (11th Cir. 1995) (citations omitted) ("Congress intended to define the term claim very broadly under § 101(5), so that 'all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case.'").  Coal Act premiums are a "right to payment," and, thus, are a "claim" that may be disposed under 11 U.S.C. § 363(f).  *Compare* 11 U.S.C. § 363(f)(5) (a free and clear sale of any interest of an entity may occur if "such entity could be compelled . . . to accept a money satisfaction of such interest") with 11 U.S.C. § 101(5)(A) ("The term 'claim' means right to payment . . . .").

F.3d at 585.  The Coal Act does not define the term "successor in interest," and Appellants have not explained how a buyer of assets can become a "successor" to an entire defunct business.

"Under the traditional rule on corporate successorship liability, a corporation that acquires manufacturing assets from another corporation does not thereby assume the liabilities of the seller."  *Holland*, 256 F.3d at 824.  "When Congress seeks to establish broad rules of successor liability, it will do so on its own. . . .  Under the Coal Act, it did not."  *Holland*, 256 F.3d at 830 (Sentelle, J., concurring); *see id.* at 822 ("A party simply acquiring property of a firm in an arm's length transaction, and taking up its business activity, does not become the selling firm's 'successor in interest'" for Coal Act purposes).

The Bankruptcy Court expressly ordered that Coal Acquisition would not be Debtors' successor for Coal Act purposes.  (Doc. # 1-3 at ¶ 17).  The Sale Order put into legal force the terms of the assets purchase agreement made by Debtors and Coal Acquisition.  (*See id.* at ¶¶ 6, 17; Doc. # 39-4 at A1432).  Had Coal Acquisition and Debtors entered such an agreement outside the confines of Walter Energy's Chapter 11 Bankruptcy, there would be no question that arm's length transaction would mean Coal Acquisition is not Debtors' "successor in interest." *See Holland*, 256 F.3d at 822.

When an entity seeks bankruptcy relief it places itself in a stricter commercial environment than that available over the open market during the normal course of business.  It places itself squarely within the confines of the Bankruptcy Code.  But, that does not change the equation here.  "The policy and purpose behind Chapter 11 proceedings is to give business debtors a respite . . ., a 'breathing spell.'"  *In re Talladega Steaks, Inc.*, 50 B.R. 42, 44 (Bankr. N.D. Ala. 1985) (citing H. Rep. No. 95-595, 95th Cong. 1st Sess. 340 (1977); S. Rep. No. 95-989, 95th Cong.2d Sess. 54-56 (1978)) (other citation omitted).  "It serves as a remedy for relief

from financial distress by permitting the rehabilitation of an ongoing business." *Id.* (citations omitted); *see also Fla. Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 37 n. 2 (2008) ("Although the central purpose of Chapter 11 is to facilitate reorganizations rather than liquidations (covered generally by Chapter 7), Chapter 11 expressly contemplates liquidations.") (citation omitted).  The conclusion championed by Appellants -- that the Bankruptcy Court lacked authority to order that Coal Acquisition do not constitute Debtors' "successor" for Coal Act purposes -- is wholly at odds with the congressional policy behind Chapter 11.  Thus, by expressly ordering that Coal Acquisition do not constitute Debtors' successor for Coal Act liabilities, the Bankruptcy Court allowed for "a remedy for relief from [Debtors'] financial distress." *In re Talladega Steaks, Inc.*, 50 B.R. at 44.  In other words, the Bankruptcy Court had legal authority to determine in advance that Coal Acquisition is a new entity and not Debtors' "successor in interest" under the Coal Act.

## VI.   Conclusion

Based on the foregoing reasons, the court concludes that the Bankruptcy Court had jurisdiction to order a free and clear sale pursuant to Section 363(f), and that Coal Act premiums are interests in property that may rightfully be extinguished under Section 363(f).  Accordingly, the Sale Order is due to be affirmed.  A separate order will be entered.

**DONE** and **ORDERED** this March 8, 2016.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE